(Decided July 20th, 1858.)

# THE STATE *vs.* ALBERT REED, (free negro.)

Alleged defects in an indictment as to *venue*, (the *margin*, however, showing that the court had jurisdiction,) and because it failed to designate the prisoner as a *free* negro, and stated his given name incorrectly, and concluded by charging the murder to have been committed by the *murdered man*, instead of the *prisoner*, are all *subjects of demurrer*, and, since the act of 1852, ch. 63, a *valid* judgment upon a verdict of *guilty* on such an indictment, the prisoner *not demurring*, could have been entered, and such judgment could not have been s*tayed*, *arrested*, or *reversed*.

A trial upon such an indictment is not, therefore, a *mistrial*, so as to enable the State to proceed anew upon another indictment, and the jury having rendered a verdict of *"not guilty*, by reason of the insufficiency of the indictment,"* the plea of *autrefois acquit* is a bar to a *second* indictment for the *same crime.*

ERROR to the Circuit Court for Cecil county.

The record in this case shows that the defendant in error was indicted in Kent county, on the 12th of November 1856, under the name of *Alfred* Reed, for the murder of George Vansant.   The indictment, containing two counts, commences: "State of Maryland, Kent county, sct.   The jurors of the State of Maryland, for the body of Kent county, do, upon their oaths, present that *Alfred* Reed, laborer, of Cecil county, on the 23rd of June 1856, in the *county aforesaid,*" and then after describing the nature of the assault with a deadly weapon, made feloniously, wilfully, and of malice aforethought, by the said *Alfred* Reed upon the said George Vansant, the wound and death, concludes each count thus: "And so the jurors aforesaid, upon their oaths aforesaid, do say that the said *George Vansant, him the said Alfred Reed,* in the manner

and form aforesaid, then and there feloniously, wilfully, and of his malice aforethought, *did kill and murder*, against," &c.

Upon the suggestion of the prisoner, the case was removed to Cecil county for trial, and at the April term, 1857, of the circuit court for that county, the prisoner pleaded *not guilty*, and a jury was then empannelled, and the trial was commenced and proceeded with until the evidence on the part of the State was closed. At this stage of the trial the attorney for the State moved to *quash the indictment*, 1st, because it charges the prisoner by the name of *Alfred* Reed, when his name is *Albert Reed;* 2nd, because it does not charge that the prisoner is a *free negro;* 3rd, because it charges that the murder was in Cecil county, instead of Kent county, in which it was really committed; and 4th, because the indictment concludes by charging that George Vansant murdered *Alfred* Reed, when it should have charged that Albert Reed murdered George Vansant. The record then states, that it appears to the court that the indictment is insufficient and erroneous, but because a jury had been empannelled and the case, by examination of witnesses, had been proceeded with until the evidence on the part of the State was closed, it ought not to be quashed, but a verdict of "not guilty, by reason of the insufficiency of the indictment," be rendered, and the jury thereupon rendered a verdict "that the said *Alfred* Reed, free negro, is not guilty, by reason of the insufficiency of the indictment," and the prisoner was then committed to the custody of the sheriff of Cecil county, to await the action of the grand jury of Kent county.

A second indictment was then found by the grand jury of Kent county, against the prisoner, charging him, in due form, under the name of Albert Reed, free negro, with the wilful murder of George L. Vansant, committed in Kent county. This indictment, also, upon suggestion of the accused, was removed to Cecil county, and when the case was there called for trial, the prisoner, by his counsel, filed a plea of *autrefois acquit*, setting forth in full the proceedings under the *first* indictment, and averring that *Alfred* Reed, mentioned therein, is the same person as Albert Reed, charged in the present indictment, and that the felony and murder mentioned in the

two indictments, is one and the same offence. To this plea the State *demurred*, but the court (PRICE, J.,) overruled the demurrer, sustained the plea, and discharged the prisoner. To correct this judgment the present writ of error was sued out by the State.

The cause was argued before LE GRAND, C. J., ECCLESTON, TUCK and BARTOL, J.

*Geo. Vickers*, for the State, argued that the first indictment was legally insufficient to warrant a judgment upon a verdict of guilty:

1st. Because it does not charge that the prisoner was a free negro. The color of the accused was *prima facie* evidence of slavery. If a slave, the owner, upon conviction, would be entitled to compensation. If convicted of manslaughter, as a free negro, he would be subjected to penitentiary imprisonment; if as a slave, he might be sold and banished; if tried without any addition, it would be as a freeman, and he would be punished accordingly, if convicted. The act of 1852, ch. 63, provides against *quashing* an indictment for the omission or misstatement of the *"title, occupation* or *degree* of the defendant,"* but none of these apply to a free negro, who has no title or degree, in a technical sense, but his condition of freedom or slavery is essential to be known before trial and conviction.

2nd. Because there was error in laying the *venue* of the murder in Cecil, instead of Kent county. That such is the meaning of the words "county aforesaid," in this indictment, is clear. *Matthews on Presumptive Evidence,* 269, and authorities there cited. Unless this defect is cured by the act of 1852, ch. 63, the objection must be fatal. The language of the act is, that no indictment, &c., shall be quashed, &c., "for want of a proper or perfect *venue,* when the court shall appear, by the indictment, &c., or by the statement of the *venue* in the *margin* thereof, to have had jurisdiction over the offence." This language seems comprehensive, but the statute is to be construed strictly, and we do not think it bears a latitudinous interpretation. The words in the *margin* can have

State *vs.* Reed.

no more force than the words in the commencement: "The jurors of the State of Maryland, for the body of Kent county." It is the place where the offence is committed that confers jurisdiction, and that place, in this indictment, is designated Cecil county. How, then, can the statement of the county, as a *videlicet*, where the indictment is found, make it appear that the court had jurisdiction? That *marginal* entry cannot explain or point to the locality where the offence was perpetrated. It can refer to nothing but the county where the indictment originated, and which is explicitly stated in the body of it. No aid is furnished by the margin to show where the crime was committed, nor are there any words in the body of the indictment capable of making such reference or explanation.

3rd. Because the indictment contained no charge of murder against the prisoner, but imputed to the deceased the murder of the accused. The error was probably made in transcribing the indictment. The mistake is, however, apparent and fatal. It may be attempted, by a change of words, and of case, to convert the conclusion into a charge of murder against Reed, but such a construction must be forced and unnatural. The conclusion of the count, which is essential to its integrity and perfection, is, "that the said George Vansant, him, the said Alfred Reed, in manner and form aforesaid, then and there feloniously, wilfully, and of his malice aforethought, did kill and murder." These words, in the order used, and in precisely the same connection, are copied from the form of an indictment in *Wharton's Cr. Prec.*, 42, and are technically and grammatically correct, with the exception of a misplacing or transposing of the names of Reed and Vansant. There is no authority to interpolate and change words to help a charge imperfectly and erroneously laid. Nor can this averment be omitted; it is vital to the charge of murder. Every indictment in the books sets it forth in that phraseology. The statement describes the character of the wound, its mortality, and the circumstances and intent with which it was inflicted, but the legal nature and character of the offence are contained only in the *conclusion*, which gives a legal form and definite name to the crime. It is the only portion of the indictment

State *vs.* Reed.

that uses the word *"murder,"* a term of art which no other word in the language can supply, and indispensable to the existence of the charge. 1 *Russell on Crimes*, 470. *Starkie's Cr. Pl.*, 96, 231. 1 *East's Crown Law*, 345, *sec.* 116. *Wharton's Cr. Law*, (*4th Ed.*,) 399. The crime is charged by way of conclusion, and as a consequence from the antecedent matter positively alleged. 1 *East's Crown Law*, 347, *sec.* 117. A verdict on an indictment is "guilty in manner and form as by the said indictment," &c. 1 *Arch. Cr. Pl.*, 193.

4th. Because the indictment was insufficient to sustain a charge of manslaughter. Manslaughter is an inferior grade of homicide, (1 *Hale*, 438,) and its definition, in *Matthews' Cr. Dig.*, 234, *sec.* 3, is: "The unlawful and felonious killing of another without malice, either express or implied." The conclusion of an indictment for manslaughter is, "feloniously, wilfully and unlawfully did kill and slay." *Wharton's Cr. Prec.*, 83, 84, 85. The words "kill and slay," are the technical terms used to define the character of manslaughter, as "murder" with "malice aforethought" are essential to the offence of the highest grade. An indictment for manslaughter never contains an allegation that the blow was struck "with malice aforethought," because such terms would describe a crime of greater magnitude. These words are essential to a count for murder, and repugnant to one for manslaughter. They are employed in this indictment, and cannot be rejected as surplussage, or stricken out by any authority except that of the court, in the presence of the grand jury, who pronounced the "true bill." 1 *East's Crown Law*, 347, *sec.* 116. On an indictment for murder, a party may be convicted of manslaughter, but in the rendition of the verdict, the jury must negative the charge of murder, or the verdict would be erroneous. 6 *Md. Rep.*, 167, *State vs. Flannigan*. But this indictment was obviously intended to be for murder, and cannot be converted into an indictment for manslaughter, and held sufficient for a verdict upon the single question of manslaughter, without referring to the question of acquittal of the highest offence.

The point raised below, by the counsel for the accused, and on which they mostly relied, was, that since the act of 1852, ch. 63, the court, upon a conviction upon the erroneous indictment, must have pronounced judgment against him, as that act prohibited a motion in arrest of judgment for any cause which might have been a subject of demurrer to the indictment. The argument, in effect, was, that though a murder might be alleged which was *impossible*, the punishment must follow in all its severity. The court will perceive that this act was framed to prevent accused parties from moving in arrest of judgment for material defects in indictments, of which they were cognizant, who, preferring the chance of escape under a trial and verdict, declined making a motion till after conviction by the jury, after the time of the court had been consumed, and further delay made necessary upon a successful effort to arrest judgment, thus increasing the expense and affording a contingency of escape from delay and the absence or death of witnesses. 6 *Md. Rep.*, 406, *Cochrane vs. The State.* It appears plain to our mind, from the reading of this statute, that it has exclusive reference and application to defendants. It declares that no arrest of judgment shall be had for any matter that might have been a cause of demurrer. As a demurrer to an indictment is a remedy exclusively belonging to defendants, and as the subjects specifically enumerated in the law as "venue," "degree," "force and arms," &c., are the peculiar subjects for demurrer, the scope, design and spirit of the law are applicable to omissions by defendants to avail themselves of the provisions of the act on motions to quash, or by demurrer. The law was evidently intended to disembarrass the State, and prevent unnecessary delay, by preventing technical and refined objections, unless introduced and made prior to trial, when new indictments might be found, obviating the objections made to the first. There must be some limitation to the terms used in the law. Suppose, in this case, the indictment had concluded by charging that Reed had murdered himself, or some other person whose name, *idem sonans*, was like Vansant's, and the error had remained undiscovered till after verdict, could the court enter judgment upon such find-

State *vs.* Reed.

ing? The verdict would be absurd, and a judgment upon it would be equally so. No such indictment could place any one in jeopardy. It is not to be presumed the Legislature would enact a law that would work out such preposterous results. The supposed cases are not more absurd than the error which was inadvertently made in this indictment. If we are correct in our interpretation of the law, it follows that if Reed had been convicted, no judgment could have been passed upon him. In 2 *Hale*, 248, it is said, the judges are bound to look into the indictment, and their judgment shall be supposed to be given upon the defect. In the present case, the opinion of the court to the jury, and the verdict, were given expressly upon the ground of an insufficient indictment. This principle is recognized in *State vs. Sutton,* 4 *Gill,* 494, and *Black vs. State,* 2 *Md. Rep.,* 376.

5th. The plea of *autrefois acquit* cannot avail the defendant. His life has not been placed in jeopardy in a legal sense; the first was a *mistrial,* and he can be tried on the second indictment. 2 *Hale,* 248. 2 *Hawk.,* 515, *ch.* 35, *sec.* 1. *Ibid.,* 517, *sec.* 3. *Ibid.,* 521, *sec.* 8. 1 *Johns.,* 66, *People vs. Barrett & Ward.* 1 *Arch. Cr. Pl.,* 111, 112, *note* 2. *Wharton's Cr. Law, (Ed. of* 1857,) *secs.* 555, 556, 573, 587. A verdict of guilty on the merits, would have been in manner and form as charged in the indictment, which charge was of an impossible thing. The verdict would have been insensible, and the court could not have entered a judgment upon it. *Wharton, (Ed. of* 1857,) *sec.* 3034.

*E. F. Chambers* and *Alex. Evans* for the defendant in error:

1st. The omission to charge the prisoner to be a free negro, is no valid objection to the indictment. The argument for the State admits that the traverser, "if tried without any addition, would be tried as a freeman, and punished accordingly." It is, therefore, precisely the same in substance and effect as if he was charged in the indictment as a "free negro." Where, then, is the error? There is no ground for this point, even before the act of 1852, ch. 63, and it is respectfully suggested that there certainly can be none since.

2nd. As to the *venue*. It is unnecessary to do more than refer the court to the 2nd section of the act of 1852, ch. 63, the clear meaning of which is, that where either the margin or the body of the indictment shows that the court taking jurisdiction is the proper tribunal before which the offence should be tried, no such indictment shall be quashed, nor shall advantage be taken of it after verdict. The proper court will, of course, be known on *proof* of the place during the trial, and it is not denied here that the place relied on in the proof is in the county in which, as appears by the body of the indictment, the jury found the indictment. It is alleged to be the work of the jurors for the body of Kent county.

3rd. It is urged that the indictment does not charge the prisoner with murder, but imputes to the deceased the murder of the accused. In answer to this objection, it is necessary to refer to the grammatical construction of the words of the indictment: "That the said George Vansant, him the said Albert Reed, in the manner and form aforesaid, then and there feloniously, wilfully, and of his malice aforethought, did kill and murder." This, *standing by itself*, is an ambiguous sentence. It may mean that Reed murdered Vansant, or that Vansant murdered Reed, with equal grammatical propriety. The context, and subject matter, and preceding words are to be looked at and examined, and they divest it of ambiguity. The court will read it, without regard to punctuation, so as to make it speak sense, and not nonsense. Many instances might be given to show that the word "him," after "Vansant," is referable to the word "Vansant," which precedes. The expression is, "Vansant, him, the said Albert Reed did kill." Him. Who? Why "him, Vansant, Albert Reed did kill." There would seem, therefore, nothing, when the subject, the context and the preceding allegations are considered, to make this so clear a charge of killing Reed by Vansant, as to say that there had been no peril on the part of the prisoner, who actually went to the jury, and had a verdict of acquittal. Was not, then, the indictment sufficient for murder?

4th. But admitting, for the sake of the argument, that the indictment was not sufficient for murder, still it is plain that it

was sufficient for manslaughter. The word "murder" is essential to an indictment for the crime of murder; that word is placed in indictments at the end, after the words "and so the jurors aforesaid," &c.; properly alleged, it might be any where else; if omitted, the indictment is for manslaughter only. *Foster's Crown Law,* 424. *Hale,* 186. This indictment contains all that is necessary in manslaughter, without including the words "and so the jurors aforesaid," &c.; the felony and killing are all set out. The counsel for the State thinks there could be no conviction of manslaughter, because the malice aforethought is set out; but this is the case in every indictment for murder, and yet convictions for manslaughter are constantly found upon them, and that without any erasure. The case where the grand jury ignore for murder, and find for manslaughter, is not this case; there it is necessary to strike out the words "murder" and "malice aforethought," because it is not proper to subject the prisoner to a chance of greater punishment than the grand inquest designed.

5th. But assuming all or any one of the points above argued to be established in favor of the State, we then hold it beyond successful controversy, that the act of 1852, ch. 63, must be an effectual bar. It is said this act was made to prevent accused parties from moving in arrest of judgment for material defects "of which they were cognizant." Cognizant when? The law presumes even accused parties to be informed of its provisions; much more must it presume learned counsel so to be. And how is the court to ascertain the *fact* of the party's knowledge, or that of his counsel, or *when* they became informed? Certainly the statute had reference to defendants, in so far that if there be a demurrer to the indictment, it must be filed by the defendant. But it is a great mistake to say the act has exclusive reference to defendants. It secures to the State not only exemption from the costs of prosecutions defeated by setting up defences after verdict, which could have been made by demurrer, but it also secures to the State the more important object of punishment inflicted on a party who is guilty, in fact, of the crime for which he is prosecuted, though not guilty according to the technical niceties of the common law. And

State *vs.* Reed.

this is the great and leading object of the act. It is not denied that the errors in the indictment, if they exist, as alleged by the State, are such as could have been properly demurred to. On the contrary, the whole argument for the State is designed to show these errors to exist, and to be gross and substantial. The act of 1852 emphatically declares, that in such a case the party, if he suffers a trial and is convicted, shall be sentenced and punished. If, therefore, the first trial had progressed, and the jury had found a verdict of guilty, this defendant in error would have suffered the penalty of the law. No motion in arrest of judgment would avail. How, then, is it possible to maintain he was in no peril on the first trial? A prisoner on trial before a jury, on whose verdict depends his chance for life or for death, in no peril? It seems to us so plain a proposition in itself, as not to admit of explanation. If, then, he was acquitted by the jury which could have convicted him, the precise case occurred in which the plea of *autrefois acquit* was peculiarly proper. After the repeated expositions of this statute by this court, in the several cases cited, it is deemed useless to add one word as to its application to such a case as the present. These cases are 6 *Md. Rep.*, 400, *Cochrane vs. The State;* 9 *Md. Rep.*, 21, *State vs. Phelps;* and 10 *Md. Rep.*, 431, *Kellenbeck & Brash vs. The State.*

LE GRAND, C. J., delivered the opinion of this court.

This appeal, we think, is conclusively settled by the second section of the act of 1852, chapter 63. If the prisoner had been found guilty on the trial under the first indictment, the only inquiry would have been, whether judgment could be entered upon the verdict of the jury? If a valid judgment could have been entered, then it was not what is technically known as a *mistrial*, which would enable the State to proceed anew under another indictment, and this being so, of course any motion in arrest of judgment would have been properly overruled. The question, then, is: Why was not the finding of the jury such as to authorize the court to award judgment? To this inquiry it is answered, the indictment was defective in several particulars, first, in its allegation of *venue;* second, in

State *vs.* Reed.

its failure to designate the prisoner as a *free* negro; third, because it charged "that the said George Vansant, him the said Albert Reed, in the manner and form aforesaid, then and there feloniously, wilfully, and of malice aforethought, did kill and murder," &c.; and fourthly, that the given name of the prisoner was incorrectly set out. Whatever may be the true philology of the averment as to the killing; that is, whether the words impute the crime to Reed or to Vansant, cannot be matter of importance in the posture of the case before this court. For, were it conceded that each and every of the objections urged by the State against the sufficiency of the indictment was well taken, they could not avail, and for the plain reason, because the law of the State says they shall not.

The act of 1852, chapter 63, expressly declares, "That no indictment or presentment for felony or misdemeanor shall be quashed, nor shall any judgment upon any indictment for any felony or misdemeanor, or upon any presentment, whether after verdict, by confession, or otherwise, be stayed or reversed for want of a proper or perfect *venue*, when the court shall appear, by the indictment, inquisition or presentment, or by the statement of the *venue* in the margin thereof, to have had jurisdiction over the offence, nor for the omission or misstatement of the title, occupation or degree of the defendant," * * * * * * *"nor for any matter or cause which might have been a subject of demurrer to the indictment."* Now it is clear that each and every of the objections urged against the first indictment, was *"matter or cause which might have been a subject of demurrer,"* and the prisoner electing not to demur, but to go to trial on the issue of not guilty, if the jury had returned a verdict of guilty against him, the judgment on such finding could not have been *"stayed or reversed."* The law pointed out the mode in which he was to take advantage of the defects in the indictment; if he failed to avail himself of it, the verdict of the jury was conclusive against him, and, if so, there would be no *mistrial;* and if no mistrial, then he is not liable to be tried again for the same crime. See, also, *The State vs. Buchanan*, 5 *H. & J.*, 329.

( Decided July 20th, 1858.) *Judgment affirmed.*